



JUDGE KOELTL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x

LACOLE SIMPSON, SHEREE STEELE,    :
DELBERT SORHAINDO and KERTH    :
POLLACK, on behalf of themselves and all other   :
similarly situated employees,    :
   :
          Plaintiffs,    :
   :
      v.    :
   :
CVS PHARMACY, INC., ANTHONY    :
SALVATORE, ABDUL SELENE, NATIA DOE, :
AMERY ATTAMEEMY, UMA DOE, HAZAN   :
DOE, HAPPY DOE and "JOHN AND JANE    :
DOES 1 through 50",    :
   :
          Defendants.    :

------------------------------------------------------------------- x

Civil Action No.:

**CLASS ACTION COMPLAINT**

**Jury Trial Demanded**



Plaintiffs allege as follows:

## PRELIMINARY STATEMENT

1.    Larry J. Merlo, the President and CEO of CVS, proudly pronounces that:

> **"There isn't a day that goes by that I am not impressed by how**
> **diverse our workforce is and by how that diversity transforms**
> **the communities we serve; but more importantly, how that**
> **appreciation of differences is a non-negotiable part of our**
> **culture, one that isn't forced, but willingly achieved together."**

2.    While these words attempt to describe a company with progressive values and an inclusive environment, the reality is that CVS intentionally targets and racially profiles its Black and Hispanic shoppers based on the highly offensive, discriminatory and ill-founded institutional belief that these minority customers are criminals and thieves.

3.    In New York City, CVS employs a covert team of Market Investigators ("MIs") within its Loss Prevention Department ("LPD") who are responsible for investigating and preventing customer theft. This team of MIs functions under racist directives that intentionally

1

target Black and Hispanic shoppers. That is, rather than attempting to prevent shoplifting by individuals of all races equally and without regard to race, Defendants repeatedly direct MIs to racially profile Black and Hispanic customers.

4.     Defendants Anthony Salvatore and Abdul Selene, Regional Loss Prevention Managers in Manhattan and Queens, respectively, were among the ringleaders of this racist and offensive approach to loss prevention that also extended to discriminatory treatment of MIs. However, this discriminatory environment was also perpetuated by a broad array of Store Managers who also supervised Plaintiffs and all other MIs. Plaintiffs' experiences under these Regional Loss Prevention Managers and Store Managers all mirror one another, as well as those of other MIs. Simply put, Plaintiffs and all other MIs have been subjected to a hostile work environment that consisted not only of being directed to discriminate but also included racist and discriminatory comments and conduct directed to them and others.

5.     By way of example only, Plaintiff Lacole Simpson, a former lead MI for approximately four years, was often told by Mr. Salvatore:

- **"These Black people are always the ones that are the thieves"**

- **"I'm going to get these Black guys"**

- **"I'm going to get this Black bitch"** or

- **"That Black Nigger over there is stealing"**

6.     Plaintiff Delbert Sorhaindo, an MI under Mr. Salvatore for four years, fared no better. Mr. Salvatore made clear to Mr. Sorhaindo that he was to racially profile customers. On many occasions, Mr. Salvatore directed Mr. Sorhaindo to patrol stores based on his belief that:

- **"Lots of Hispanic people steal there"** or

2

- **"There are a lot of crack heads that are usually stealing at that store"**

7.     Mr. Sorhaindo was also present when Mr. Salvatore said, with regard to a fellow Hispanic MI:

- **"That Spanish guy is a worthless piece of shit"**

8.     Plaintiff Kerth Pollack, another former MI who also worked for CVS for approximately four years, experienced an identical environment permeated with race-baiting by Mr. Salvatore. Mr. Salvatore would routinely direct Mr. Pollack to:

- **"Watch that Black guy"** or

- **"Follow that Black guy"**

9.     Mr. Salvatore would give these directions even when there was no evidence or indication that the Black shopper was going to steal anything, and would never give such directions with regard to White shoppers.

10.    The list goes on. Plaintiff Sheree Steele, another former MI who worked in Queens under Mr. Selene, was also directed to racially profile. Mr. Selene constantly instructed Ms. Steele to follow only Black and Hispanic shoppers and repeatedly stated:

- **"You have to catch more thieves. You know how these young Black guys are"**

- **"Watch the Black and Hispanic people to catch more cases"**

- **"Follow that Black man"** or

- **"Watch that Hispanic guy"**

11.    When visiting MIs at CVS locations, Mr. Salvatore and Mr. Selene would often point to Black individuals as they walked into the store and "predict" that they were going to steal. Mr. Salvatore and Mr. Selene would regularly tell Plaintiffs and other MIs to:

- **"Look at that Black guy, he looks like he's going to steal something."**

12.     Unfortunately, the racist conduct of Mr. Salvatore and Mr. Selene is only the proverbial "tip of the iceberg." Many CVS Store Managers – who also direct MIs in the performance of their jobs – also engage in discriminatory conduct.

13.     One CVS Store Manager, Natia Doe, often directed MIs in her store – including Ms. Simpson, Mr. Sorhaindo and Mr. Pollack – to:

- **"Watch that Black guy"** or
- **"That Black guy looks like a bum – go watch him"**

14.     Natia Doe even told Mr. Pollack, who is Black, that:

- **"I thought you were a shoplifter when I first saw you"**

15.     A second Store Manager, Amery Attameemy, similarly directed MIs to racially profile. Almost as a mantra, when a Black customer would enter the store, he instructed the MIs:

- **"There is a Black guy in that isle – go watch him"**

16.     Mr. Attameemy would also often exclaim:

- **"This Black motherfucker is stealing"**

17.     A third Store Manager, Uma Doe, referred to Ms. Simpson as a:

- **"Black nigga bitch"**

18.     Uma Doe also had a policy prohibiting any Black employees from entering her office. Indeed, on one occasion when Mr. Pollack attempted to enter her office, the Assistant Store Manager told him that:

- **"She [the Store Manager] does not allow Blacks in her office"**

19.     When this was brought to the attention of Mr. Salvatore, he replied simply, **"It's her store**." No remedial or corrective action was ever taken.

20.     Yet another CVS Store Manager, Hazan Doe, told Mr. Sorhaindo that in order to avoid detection by customers, he should:

- **"Hide like a monkey"**

21.     Hazan Doe also would routinely instruct MIs to "**watch that Black guy**" whenever a Black shopper would enter his store.   He would also routinely bring MIs into his office to show them security footage of alleged thefts and make comments such as:

- **"Let me show you what this Black nigger did"**

22.     Referring to an Hispanic employee, a fifth Store Manager, Happy Doe, stated:

- **"I don't want his Hispanic ass in my store."**

23.     Plaintiffs complained about these discriminatory practices both to Human Resources ("HR") and to Juan Madrid, who runs the LPD in New York City.  Mr. Salvatore and Mr. Selene both report to Mr. Madrid.  These complaints went virtually unanswered, and no remedial action was taken.

24.     As a result of being forced to work in such an incredibly discriminatory environment, Ms. Simpson, Mr. Pollack and Mr. Sorhaindo were constructively discharged.  Ms. Steele was retaliated against for her complaints of discrimination when CVS refused to permit her to return to work following a brief approved leave in July 2013.

25.     The discriminatory attitudes that permeate throughout CVS's New York City stores are the logical extension and result of an institution without any diversity in its corporate leadership.  In fact, CVS's own website contains a list of the Company's "Leadership," which is made up of the top 12 executives, all of whom are White.[1]

---

[1]     http://investors.cvshealth.com/corporate-governance/leadership.aspx

26.     As such, Plaintiffs bring individual and class claims for Defendants' unlawful discriminatory and retaliatory employment practices under (i) Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); (ii) the New York State Human Rights Law, New York Executive Law §§ 290 *et seq.* (the "NYSHRL"); and (iii) the New York City Human Rights Law, N.Y.C. Administrative Code §§ 8-107 *et seq.* (the "NYCHRL").

## JURISDICTION AND VENUE

27.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiffs' rights under Section 1981.  The Court has supplemental jurisdiction over Plaintiffs' related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

28.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PROCEDURAL REQUIREMENTS

29.     Plaintiffs will be filing charges of discrimination, on behalf of themselves and the Proposed Class (as defined below), arising out of the facts described herein, with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").  When the EEOC completes its investigation of the charges and issues Plaintiffs' notices of right to sue, Plaintiffs will seek leave to amend this Complaint to add causes of action for Defendants' violations of Title VII.

30.     Pursuant to NYCHRL § 8-502, Plaintiffs will serve a copy of this Complaint upon the New York City Commission on Human Rights and the New York City Law Department,

Office of the Corporation Counsel, within ten days of its filing, thereby satisfying the notice requirements of that section.

31.     Any and all other prerequisites to the filing of this suit have been and, with the filing of the EEOC charge, will be met.

## PARTIES

32.     Plaintiff Lacole Simpson is an African-American female who resides in Brooklyn, New York. At all relevant times herein, Ms. Simpson met the definition of an "employee" under all applicable statutes. Ms. Simpson began her employment as an MI on or around January 25, 2011 and worked in that position until February 15, 2015 when she was constructively discharged.

33.     Plaintiff Kerth Pollack is an African-American male who resides in Queens, New York. At all relevant times herein, Mr. Pollack met the definition of an "employee" under all applicable statutes. Mr. Pollack began his employment as an MI in or around February 2011 and worked in that position until March 2015 when he was constructively discharged.

34.     Plaintiff Delbert Sorhaindo is a Hispanic male who resides in Brooklyn, New York. At all relevant times herein, Mr. Sorhaindo met the definition of an "employee" under all applicable statutes. Mr. Sorhaindo began his employment as an MI on or around January 28, 2011 and worked in that position until April 2015 when he was constructively discharged.

35.     Plaintiff Sheree Steele is an African-American female who resides in Brooklyn, New York. At all relevant times herein, Ms. Steele met the definition of an "employee" under all applicable statutes. Ms. Steele began her employment as an MI in or around January 2013 and worked in that position until July 2013, after which CVS refused to permit her to return to work after a brief leave of absence in retaliation for her complaints of discrimination.

36.     Defendant CVS Pharmacy Inc. is a Rhode Island corporation with its headquarters and corporate offices in Woonsocket, Rhode Island.  CVS owns and operates hundreds of stores located throughout New York City and the United States.  At all relevant times herein, CVS met the definition of an "employer" of Plaintiffs and the Proposed Class (as defined below) under all applicable statutes.

37.     Upon information and belief, Defendant Anthony Salvatore, the Regional Loss Prevention Manager for the Manhattan Region, resides in the State of New York.  At all relevant times herein, Mr. Salvatore met the definition of an "employer" of Ms. Simpson, Mr. Pollack and Mr. Sorhaindo, as well many other members of the Proposed Class (as defined below) under all applicable statutes.  Mr. Salvatore also directed and participated in the unlawful and discriminatory conduct described herein towards Plaintiffs and the Proposed Class.

38.     Upon information and belief, Defendant Abdul Selene, the Regional Loss Prevention Manager for the Queens Region, resides in the State of New York.  At all relevant times herein, Mr. Selene met the definition of an "employer" of Ms. Steele, as well many other members of the Proposed Class (as defined below) under all applicable statutes.  Mr. Selene also directed and participated in the unlawful and discriminatory conduct described herein towards Plaintiffs and the Proposed Class (as defined below).

39.     Upon information and belief, Defendant Natia Doe resides in the State of New York.  At all relevant times, Natia Doe met the definition of a "supervisor" and participated in the discriminatory conduct alleged herein.  Natia Doe was employed at CVS's store located at 53rd Street and Lexington Avenue in New York City.

40.     Upon information and belief, Defendant Amery Attameemy resides in the State of New York.  At all relevant times, Mr. Attameemy met the definition of a "supervisor" and

8

participated in the discriminatory conduct alleged herein.  Mr. Attameemy was employed at CVS's store located at 300 Park Avenue South in New York City.

41.     Upon information and belief, Defendant Uma Doe resides in the State of New York.  At all relevant times, Uma Doe met the definition of a "supervisor" and participated in the discriminatory conduct alleged herein.  Uma Doe was employed at CVS's store located at 42nd Street and Lexington Avenue, as well as 57th Street and 8th Avenue in New York City.

42.     Upon information and belief, Defendant Hazan Doe resides in the State of New York.  At all relevant times, Hazan Doe met the definition of a "supervisor" and participated in the discriminatory conduct alleged herein.  Hazan Doe was employed at CVS's store located at 129 Fulton Street in New York City.

43.     Upon information and belief, Defendant Happy Doe resides in the State of New York.  At all relevant times, Happy Doe met the definition of a "supervisor" and participated in the discriminatory conduct alleged herein.  Hazan Doe was employed at CVS's store located at 64th Street and 2nd Avenue in New York City.

44.     Defendants "John and Jane Does 1 through 50" are Regional Loss Prevention Managers and Store Mangers working for CVS in New York City who also participated in the discriminatory and retaliatory conduct alleged herein.

## FACTUAL ALLEGATIONS

**I.     Defendants' Loss Prevention Department**

45.     CVS maintains a team of MIs, or "Store Detectives," within their Loss Prevention Department in the New York City region.  The purpose of the MI team is to detect and prevent shoplifting in CVS's stores.  The MI team consists of a Regional Head (Juan Madrid), Regional Loss Prevention Managers (including Mr. Salvatore and Mr. Selene), and MIs (including

Plaintiffs) who report to both their Regional Loss Prevention Manager and the CVS Store

Managers where they are stationed.

46.     The MIs patrol undercover at stores in New York City and use a variety of tools

to detect and stymie store theft, including, but not limited to (i) analyzing store crime data, (ii)

collaborating with local police such as the New York City Police Department ("NYPD"), (iii)

partnering with Store Managers familiar with patterns of theft at each location, (iv) reviewing

security footage, (v) participating in team meetings wherein patterns of theft are discussed and

analyzed, and (vi) stationing undercover MIs in stores to observe and detain shoplifters.

47.     Regional Loss Prevention Managers (who all report to Mr. Madrid), as well as

Store Managers, supervise and manage the MIs in New York City.

48.     Regional Loss Prevention Managers are responsible for utilizing and

implementing the tools described above, running all aspects of the MI team and providing the

MIs with leadership and directives in carrying out their duties.  MIs are required to follow the

directions and instructions of their Regional Loss Prevention Manager, and report directly to

their Regional Loss Prevention Manager.  Regional Loss Prevention Managers, including Mr.

Salvatore and Mr. Selene, also often supervise MIs while they are "in the field," and also provide

training and reviews.  Regional Loss Prevention Managers are also responsible for supervising,

disciplining and making employment decisions concerning MIs.

49.     Store Managers have a similar supervisory position over MIs.  While MIs

formally report directly to the Regional Loss Prevention Manager, they are required to follow the

directives and instruction of the Store Manager at whichever CVS store they are assigned to

patrol.  This includes any direction and instruction with regard to the performance of the MI job,

including the manner in which MIs patrol the store and decisions regarding whether a suspected

shoplifter should be arrested or not.  If MIs do not follow the directives of the Store Managers, they can be subject to discipline, up to and including termination.

50.     This dual-reporting structure is described in the MI job description contained on CVS's website: "this position reports directly to a Regional Loss Prevention Manager, and regularly to Store Management and District Sales Managers."[2]

51.     The ultimate goal of the MIs is to identify and apprehend criminals in accordance with the directives they are given.  After apprehending a suspected thief, MIs are responsible for recording the individual's identification information, retrieving stolen merchandise and logging information into CVS's database.  MIs also fill out incident reports and, when a shoplifter is arrested, cooperate with the police and prosecution, including providing statements and evidence to law enforcement and testifying in court and/or before a Grand Jury.

**II.     Racial Profiling and Discrimination by Regional Loss Prevention Managers**

52.     Defendants' team of MIs was directed to follow utterly despicable and racist directives.  Specifically, they were repeatedly instructed to intentionally target and racially profile Black and Hispanic shoppers.  MIs also were forced to endure the nearly constant use of racial slurs and discriminatory language on the part of Mr. Salvatore, Mr. Selene and the Store Managers in the New York City Region.

53.     MIs spend the majority of their time in the field attempting to prevent crime at CVS's most crime-heavy locations.  While on duty, MIs are required to carry out their duties in accordance with the information, analysis and directives provided by their Regional Loss Prevention Manager and Store Managers.

---

[2]     See http://jobs.cvshealth.com/new-york-state/loss-prevention/jobid7015158-loss-prevention-spec-ii-jobs.

54.     Throughout Plaintiffs' employment, Mr. Salvatore and Mr. Selene would meet with the members of their respective MI teams to discuss loss prevention strategy.

55.     Mr. Salvatore regularly used these interactions to promote his racist approach to loss prevention, which could always be summarized as follows: target and racially profile Black and Hispanic customers.

56.     Mr. Salvatore would routinely advise subordinate MIs that the "**Black people always are the ones that are the thieves**" and "**lots of Hispanic people steal at that store.**"

57.     Similarly, Mr. Selene, who, upon information and belief, was trained by Mr. Salvatore, would regularly instruct MIs to focus on Black shoppers to increase the frequency of their stops and arrests by saying, "**you have to catch more thieves, you know how these young Black guys are**" and "**watch the Black and Hispanic people to catch more cases.**"

58.     Mr. Salvatore and Mr. Selene would also often refer to suspected Black and Hispanic shoplifters in racially overt terms.  By way of example only, Mr. Salvatore would refer to Black shoplifters as "**Black niggers**" and "**Black bitches**" and Hispanic shoplifters as "**Hispanic bitches.**"

59.     Mr. Salvatore would also regularly proclaim that he was "**going to get these Black guys**" or "**Black bitches,**" when referring to Black shoppers.  He did not use any race or color-specific language when referring to suspected White shoplifters.

60.     Mr. Selene would constantly refer to the specific race of any Black or Hispanic suspected shoplifter.  He did not refer to the race of any suspected White shoplifters.

61.     Regional Loss Prevention Managers also often visited MIs "in the field."  When doing so, Regional Loss Prevention Manager, including Mr. Salvatore and Mr. Selene, would often watch live security footage with MIs on the store's television feeds (generally maintained

in a back office).  While watching, Mr. Salvatore and Mr. Selene would comment in a disparaging manner with regard to minorities who had not even engaged in shoplifting.

62.     By way of example only, Mr. Salvatore and Mr. Selene would often point to Black individuals as they walked into the store and "predict" that they were going to steal. Indeed, Mr. Salvatore and Mr. Selene would regularly tell Plaintiffs and other MIs to "**look at that Black guy [on the security feed], he looks like he's going to steal something.**"

63.     Moreover, while visiting CVS locations, Mr. Salvatore and Mr. Selene would always ask subordinate MIs to track and follow Black customers, even when there was no indication whatsoever that they were intending to steal.

64.     Mr. Salvatore and Mr. Selene would never request that MIs follow White customers.  To the contrary, even when a White person was caught stealing, Mr. Salvatore and Mr. Selene would often direct that he or she be let go, whereas Black and Hispanic customers engaging in similar theft would be arrested.

65.     Mr. Salvatore's treatment of the MIs was no better than his treatment of minority customers.  He also repeatedly referred to CVS employees, including Plaintiffs and other MIs, in racially derogatory terms.

66.     By way of example only, a Store Manager became upset with Mr. Pollack and called Mr. Salvatore.  Mr. Salvatore called Mr. Pollack, who had left the store, and demanded that he "**get his Black ass back to the store and apologize.**"

67.     On another occasion, Mr. Salvatore remarked about a Hispanic MI as follows: "**That Spanish guy is a worthless piece of shit.**"

68.     These examples constitute just a few examples of the racist and discriminatory directives espoused by Regional Loss Prevention Managers Mr. Salvatore and Mr. Selene during

their daily interactions with the MIs, which are emblematic of the institutionally discriminatory environment for New York City MIs that Defendants created, fostered and advanced.

**III.   Racial Profiling and Discrimination by Store Managers**

69.     As if being subjected to daily racially hostile conduct by the Regional Loss Prevention Managers was not bad enough, MIs in New York City were and are also subjected to extremely racist conduct at the hands of their dual-supervisors: CVS's Store Managers.

70.     Natia Doe often explicitly directed MIs in her store to racially profile by telling them to **"watch that Black guy"** or remarking, **"that Black guy looks like a bum – go watch him."** She even told Mr. Pollack, that she believed he was a shoplifter when she first saw him. She also would repeatedly request that MIs in her store **"lock up"** Black and Hispanic shoplifters, but would often instruct the release White shoplifters.

71.     Similarly, another Manhattan Store Manager, Mr. Attameemy, was completely obsessed with protecting his store against Black and Hispanic customers because of his belief that minorities are all shoplifters. For example, on many occasions when an MI would first come to the store, he would insist that minorities had been shoplifting before the MI arrived and bring the MI to the back office to review video of the alleged shoplifting. However, quite often, the video did not reveal that any shoplifting had occurred.

72.     By way of example only, one afternoon he approached Ms. Simpson and complained that earlier in the day **"six Black guys came into the store and cleaned it out."** Mr. Attameemy brought Ms. Simpson to the back office to show her the video of these six Black individuals. No theft at all could be observed on the video. Occurrences like this were frequent at the CVS stores he managed.

73.     Mr. Attameemy would also often instruct the MIs in his store: **"There is a Black person in this isle – go watch him."** He would also refer to minority shoplifters in racial terms, such as saying, **"this Black guy is taking all of my shampoo"** and "**this Black motherfucker is stealing.**"

74.     Another Manhattan Store Manager, Hazan Doe, would make similar comments about minorities. He also would routinely direct MIs to watch any Black person that entered the store, even though there was no evidence that he or she was planning to steal anything. He also directed Mr. Sorhaindo to **"hide like a monkey"** to avoid detection by potential shoplifters. Moreover, he would routinely bring MIs into his office to show them security footage of alleged thefts and make racist comments such as, **"Let me show you what this Black nigger did."**

75.     Another Manhattan Store Manager, Happy Doe, openly stated with regard to one employee, **"I don't want his Hispanic ass in my store."**

76.     Yet another CVS Store Manager in Manhattan, Uma Doe, instituted a policy prohibiting any Black employees from entering her office. When Ms. Simpson complained about this policy to Mr. Salvatore, he responded simply: "It's her store." This same store manager also referred to Ms. Simpson as a **"Black nigga bitch."**

77.     Upon information and belief, John and Jane Doe Store Managers in Manhattan engaged in similar and identical conduct as Natia Doe, Mr. Attameemy, Hazan Doe, Uma Doe and Happy Doe. In particular, upon information and belief, John and Jane Doe Store Managers regularly instructed their MIs to racially profile by directing them to concentrate and track only Black and Hispanic customers

78.     CVS's Store Managers in Queens engaged in similar and identical conduct as those in Manhattan.  In particular, many Store Managers in Queens regularly instructed their MIs to racially profile by directing them to concentrate and track only Black and Hispanic customers.

**IV.    Unlawful Retaliation**

79.     Naturally, in an environment so permeated with discrimination and where MIs were forced to act in a discriminatory manner in carrying out their jobs, employees invariably complained to management, including all four Plaintiffs.

80.     These complaints were made both to HR and Mr. Madrid, who, as stated, is the head of the entire MI team in New York City.  These complaints went virtually unanswered.  No real investigation was ever conducted, and no remedial action was ever taken.

81.     To the contrary, MIs, who were courageous enough to complain about the hostile work environment and discrimination at CVS, were subject to unlawful retaliation.

82.     By way of example only, after complaining to HR and Mr. Madrid with regard to the unlawful discrimination and racial profiling at CVS, Mr. Sorhaindo was falsely accused of engaging in misconduct – for the first time in four years of employment – which was entirely fabricated.

83.     Similarly, within weeks of Ms. Simpson's and Mr. Pollack's express complaints of discrimination and racial profiling, they were subjected to increased scrutiny, micromanagement and fabricated performance criticisms as part of a clear effort to create a paper trail for the eventual termination.

84.     Given the extreme discrimination and retaliation to which Mr. Pollack, Ms. Simpson and Mr. Sorhaindo were subjected, they were constructively discharged in February 2015, March 2015 and April 2015, respectively.

85.     Ms. Steele also complained about unlawful discrimination and racial profiling at CVS to HR and Mr. Madrid, and requested a transfer.  CVS failed to remedy the situation and refused to permit the transfer.  Mere months later, CVS refused to permit Ms. Steele to return to work following her return from a brief approved leave in blatant retaliation for her complaints.

## CLASS ACTION ALLEGATIONS
### (Section 1981, NYSHRL and NYCHRL)

I.     **Class Definition**

86.     This is a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23, brought by Plaintiffs on behalf of a Proposed Class of similarly situated employees.  The Proposed Class (subject to future revision as may be necessary), is defined as follows:

> **All CVS MIs, Store Detectives and/or employees with job duties similar to those of an MI and/or Store Detective, who have worked and/or are working in New York City and/or under the same Regional Loss Prevention Managers as New York City MIs at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case.**

87.     The unlawful conduct suffered by Plaintiffs and the members of the Proposed Class, includes, but is not limited to:

- Directing Plaintiffs and the Proposed Class to engage in racial profiling on a daily basis in the performance of their jobs;

- Subjecting Plaintiffs to repeated and highly offensive and patently racist comments, including the use of the words and terms "nigger" and "monkey;"

- Failing to prevent, address, properly investigate and/or take remedial action regarding discrimination committed against Plaintiffs and the Proposed Class; and;

- Retaliating against employees who report or complain about Defendants' discriminatory conduct, including, but not limited to, terminating their employment.

88.     Upon information and belief, the Proposed Class contains more than 40 members during the applicable limitations period.

89.     Plaintiffs and the Proposed Class have standing to seek such relief because of the adverse effects that Defendants' unlawful patterns, practices and/or policies have had on them individually and generally.

90.     The patterns, practices and/or policies described in this Complaint demonstrate that discrimination and retaliation are not unusual at the Company; rather, they are part and parcel to its standard operating patterns, practices and/or policies.

## II.     Numerosity and Impracticality of Joinder

91.     The members of the Proposed Class are sufficiently numerous to make joinder of their claims impracticable.  While the exact number of Proposed Class members is unknown because such information is in the exclusive control of Defendants, upon information and belief, there more than 40 current and former employees who have been the victim of the discriminatory and retaliatory conduct and adverse employment actions described herein.

92.     Although precise determination of the number of Proposed Class members is incapable at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

## III.     Common Questions of Law and Fact

93.     The claims alleged on behalf of Plaintiffs and the Proposed Class raise questions of law and fact common to all Plaintiffs and Proposed Class members.  Chief among these questions is as follows:

- Whether Defendants had patterns, practices and/or policies fostering and resulting in systemic unlawful discrimination and retaliation against employees working as MIs or Store Detectives in New York City;

- Whether employees working as MIs or Store Detectives in New York City were subjected to a pattern, practice and/or policy whereby they were required to engage in racial profiling in the carrying out of their job duties;

- Whether employees working as MIs or Store Detectives in New York City were subjected to a pattern, practice and/or policy whereby they were subjected to a myriad of highly offensive racial slurs such as "nigger" and "monkey," among others; and,

- Whether employees working as MIs or Store Detectives in New York City were subjected to a pattern, practice and/or policy of retaliation in connection with the reporting of discrimination, discriminatory conduct and/or retaliation.

94.     Thus, the common question requirement of FRCP 23(a) is satisfied.

## IV.     Typicality of Claims and Relief Sought

95.     Plaintiffs are members of the Class they seek to represent.

96.     The claims of Plaintiffs are typical of the claims of the Proposed Class in that they all arise from the same unlawful patterns, practices and/or policies of Defendants, and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by federal, state and local law.

97.     Plaintiffs and the members of the Proposed Class all allege that they each were the victim of unlawful adverse employment decisions and/or a hostile work environment based on race and/or color and/or in retaliation for complaints regarding unlawful discrimination.

98.     The relief that Plaintiffs seek for Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Proposed Class.

99.     Thus, the typicality requirement of FRCP 23(a) is satisfied.

## V.     Adequacy of Representation

100.     The interests of Plaintiffs are co-extensive with those of the Proposed Class they seek to represent in the instant case.

101.     Plaintiffs are willing and able to represent the Proposed Class fairly and vigorously as they pursue their similar individual claims.

102.     Plaintiffs have retained counsel who are qualified and experienced in employment class action litigation and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

103.     The combined interests, experience and resources of Plaintiffs and their counsel to competently litigate the individual and Class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

## VI.    Requirements of Rule 23(b)(1)

104.     Without Class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.  Specifically, all evidence of Defendants' patterns, practices and/or policies and the issue of whether they are in violation of federal, state and local law would be exchanged and litigated repeatedly.  Accordingly, certification of the Proposed Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Proposed Class and Defendants.

105.     By filing this Complaint, Plaintiffs are preserving the rights of Proposed Class members with respect to the statute of limitations on their claims.  Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

## VII.   Requirements of Rule 23(b)(2)

106.     Defendants have acted on grounds, described herein, generally applicable to Plaintiffs and the members of the Proposed Class, by adopting and following systemic patterns,

practices and/or policies that are discriminatory and retaliatory towards employees who have worked and/or are working as MIs or Store Detectives in New York City.

107. These discriminatory and retaliatory acts are fostered by Defendants' standard patterns, practices and/or policies, are not sporadic or isolated, and support the request for final injunctive and declaratory relief with respect to Plaintiffs and the Proposed Class as a whole.

108. Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination based on race and/or color and/or engagement in protected activity committed against employees who have worked and/or are working as MIs or Store Detectives in New York City.

109. Declaratory and injunctive relief are the factual and legal predicates for Plaintiffs' and the Class Members' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination and retaliation.

110. Accordingly, injunctive and declaratory relief are among the predominant forms of relief sought in this case.

## VIII. Requirements of Rule 23(b)(3)

111. The common issues of fact and law affecting Plaintiffs' claims and those of the Proposed Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

112. A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the Proposed Class.

113. The cost of proving Defendants' pattern and practice of discrimination makes it impracticable for the members of the Proposed Class to pursue their claims individually.

114.     The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of the Proposed Class (they must have worked in New York City and in the capacity of an MI, Store Detective or another position with similar duties), as well as the common questions of law and fact described above.

**FIRST CAUSE OF ACTION**
**(Discrimination and Retaliation in Violation of Section 1981)**
***Against All Defendants***

115.     Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

116.     As described above, Defendants have discriminated and retaliated against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of Section 1981 by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment that has included, among other things, directing Plaintiffs and the Proposed Class members to engage in racial profiling, and being subjected to discriminatory and retaliatory conduct.

117.     As a direct and proximate result of Defendants' unlawful discriminatory and retaliatory conduct in violation of Section 1981, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

118.     Defendants' unlawful discriminatory and retaliatory actions constitute malicious, willful and wanton violations of Section 1981 for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION
### (Discrimination and Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

119.    Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

120.    As described above, Defendants have discriminated and retaliated against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of the NYSHRL by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment that has included, among other things, directing Plaintiffs and the Proposed Class members to engage in racial profiling, and being subjected to discriminatory and retaliatory conduct.

121.    As a direct and proximate result of Defendants' unlawful discriminatory and retaliatory conduct in violation of the NYSHRL, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

## THIRD CAUSE OF ACTION
### (Discrimination and Retaliation in Violation of the NYCHRL)
### *Against All Defendants*

122.    Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

123.    As described above, Defendants have discriminated and retaliated against Plaintiffs and the Proposed Class on the basis of race and/or color in violation of the NYCHRL by fostering, condoning, accepting, ratifying and/or otherwise failing to prevent or remedy a hostile work environment that has included, among other things, directing Plaintiffs and the

Proposed Class members to engage in racial profiling, and being subjected to discriminatory and retaliatory conduct.

124.    As a direct and proximate result of Defendants' unlawful discriminatory and retaliatory conduct in violation of the NYCHRL, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

125.    Defendants' unlawful discriminatory and retaliatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

**FOURTH CAUSE OF ACTION**
**(Aiding and Abetting Violations of NYSHRL)**
*Against Defendants Salvatore, Selene and "John Does 1 through 50"*

126.    Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

127.    Defendants Salvatore, Selene and "John Doe's 1 through 50" knowingly or recklessly aided and abetted the unlawful discrimination and retaliation to which Plaintiffs and the Proposed Class were subjected in violation of the NYSHRL.

128.    As a direct and proximate result of Defendant Salvatore's, Selene's and "John Does 1 through 50's" aiding and abetting of unlawful discriminatory and retaliatory conduct in violation of NYSHRL, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

## FIFTH CAUSE OF ACTION
### (Aiding and Abetting Violations of NYCHRL)
#### *Against Defendants Salvatore, Selene and "John Does 1 through 50"*

129.    Plaintiffs, on behalf of themselves and the Proposed Class, hereby repeat, reiterate and re-allege each and every previous allegation as if fully set forth herein.

130.    Defendant Salvatore, Selene and "John Doe's 1 through 50" knowingly or recklessly aided and abetted the unlawful discrimination and retaliation to which Plaintiffs and the Proposed Class were subjected in violation of the NYCHRL.

131.    As a direct and proximate result of Defendant Salvatore's, Selene's and "John Doe 1 through 50's" aiding and abetting of unlawful discriminatory and retaliatory conduct in violation of NYCHRL, Plaintiffs and the Proposed Class have suffered, and continue to suffer, economic damages, mental anguish and emotional distress for which they are entitled to an award of damages.

132.    Defendant Salvatore's, Selene's and "John Doe 1 through 50's" unlawful aiding and abetting constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiffs and the Proposed Class are entitled to an award of punitive damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Proposed Class, pray that the Court enter judgment in their favor and against Defendants, containing the following relief:

A.    Certification of the case as a class action maintainable under FRCP 23, on behalf of the Proposed Class;

B.    Designation of Plaintiffs as representatives of this Proposed Class;

C.    Designation of Plaintiffs' counsel of record as class counsel;

D.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

E.      An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

F.      An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect the lives of Plaintiffs and the Proposed Class;

G.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs and the Proposed Class for all monetary and/or economic damages;

H.      An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiffs and the Proposed Class for all non-monetary and/or compensatory damages;

I.      An award of punitive damages, and any applicable penalties;

J.      Prejudgment interest on all amounts due;

K.      An award of costs that Plaintiffs and the Proposed Class incur in this action, as well as an award of reasonable attorneys' fees to the fullest extent permitted by law; and

L.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues of fact and damages.

Dated: June 3, 2015
      New York, New York

                                    Respectfully Submitted,

                                    **WIGDOR LLP**

                                    By: _____
                                           Douglas H. Wigdor
                                         David E. Gottlieb
                                         Michael J. Willemin

                                    85 Fifth Avenue
                                    New York, New York 10003
                                    Tel: (212) 257-6800
                                    Fax: (212) 257-6845
                                    dwigdor@wigdorlaw.com
                                    dgottlieb@wigdorlaw.com
                                    mwillemin@wigdorlaw.com

                                    *Counsel for Plaintiffs and*
                                    *the Proposed Class*