UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————

ZAIRE LAMARR-ARRUZ and MOMINNA
ANSORALLI, on behalf of themselves
and all other similarly situated          15-cv-04261 (JGK)
employees,
                                          OPINION AND ORDER
                    Plaintiffs,

         - against -

CVS PHARMACY, INC.,

                    Defendant.

—————————————————————

JOHN G. KOELTL, District Judge:

     This case is about an allegedly hostile work environment

caused by directions to use racial profiling against black and

Hispanic store customers and by an alleged barrage of racial

slurs in the workplace.

     Zaire Lamarr-Arruz[1] and Mominna Ansoralli (collectively, the

"plaintiffs") on behalf of a purported class have brought claims

against the defendant, CVS Pharmacy, Inc. ("CVS" or the

"Company"), for hostile work environment pursuant to 42 U.S.C.

§ 1981, as amended by the Civil Rights Act of 1991; the New York

Human Rights Law, New York State Executive Law § 296 et seq.

(the "NYSHRL"); and the New York City Human Rights Law,

Administrative Code of the City of New York § 8-101 et seq. (the

---

[1] Zaire Lamarr-Arruz was previously known as Sheree Steele. See
Dkt. 236. He now identifies himself as a man and the Court will
follow that designation.

1

"NYCHRL"). In addition, Lamarr-Arruz, on behalf of himself only, has brought a retaliation claim against CVS under the same provisions.[2]

CVS has filed motions for summary judgment to dismiss the claims pursuant to Rule 56 of the Federal Rules of Civil Procedure.[3]

For the following reasons, the motions for summary judgment are **denied.**

## I.

Pursuant to Federal Rule of Civil Procedure 56(a), "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Darnell v. Pineiro, 849 F.3d 17, 22 (2d Cir. 2017). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it

---

[2] Ansoralli has abandoned her claim of retaliation. See Dkt. 156 (Trans. of Conference dated Oct. 17, 2016) at 9.

[3] CVS has also filed a motion to exclude the proposed testimony of the plaintiffs' expert witness, David L. Crawford, Ph.D., and the plaintiffs have filed a motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. Those motions are addressed in a separate Opinion and Order.

does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matters that "it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ." Ying

3

Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993);
see also Cohen v. Walcott, No. 13-cv-9181 (JGK), 2017 WL
2729091, at *1 (S.D.N.Y. June 23, 2017).

## II.

Many of the relevant facts are disputed. The following
facts, construed in the light most favorable to the plaintiffs,
are undisputed unless otherwise noted.

CVS is a Rhode Island corporation that owns and operates
retail drugstores throughout the United States, including in New
York City. Second Am. Compl. ("SAC") ¶ 14.

CVS employs undercover security guards in plainclothes
known as "Market Investigators" (also known as "Store
Detectives"). Market Investigators are tasked with "loss
prevention," which includes, among other things, patrolling CVS
stores and apprehending shoplifters. Lamarr-Arruz R. 56.1
Counterst. ¶ 5.[4] Market Investigators work at multiple CVS stores
(including multiple stores in a given workweek) and rotate among
CVS stores. See, e.g., Gaites Decl. Ex. 1 (CVS Market
Investigator Training Presentation dated Mar. 2011) at CVS
00002898.

Lamarr-Arruz, who is African-American, worked as a Market
Investigator from around February 18, 2013 to November 14, 2013.

---

[4] Where the evidence with respect to Lamarr-Arruz and Ansoralli
is duplicative, only the evidence presented in connection with
Lamarr-Arruz's motion will be cited.

Gottlieb Decl. Ex. 2 (Lamarr-Arruz CVS Employee Profile).
Lamarr-Arruz worked as a Market Investigator in several CVS
stores in Brooklyn and Queens and was at least trained at CVS
stores in Manhattan. Lamarr-Arruz R. 56.1 Counterst. ¶ 23.
Before he was hired as a Market Investigator, Lamarr-Arruz
worked for a CVS contractor as a security guard in CVS stores.
Lamarr-Arruz R. 56.1 Counterst. ¶ 18.

Ansoralli is of Spanish, Portuguese, and West Indian
(Guyanese) descent. Gottlieb Decl., Exhibit 31 (Ansoralli Dep.
dated Mar. 21, 2016) at 19, 169. Ansoralli's mother is from
Guyana. Gottlieb Decl., Exhibit 31 at 308; Ansoralli R. 56.1
Counterst. ¶ 9. Ansoralli was employed as a Market Investigator
from October 2012 to February 2013. Ansoralli R. 56.1 Counterst.
¶ 39; Gottlieb Decl., Exhibit 90 (Ansoralli CVS Employee
Profile). Ansoralli worked as a Market Investigator in several
CVS stores in Brooklyn, Queens, and Manhattan. Ansoralli R. 56.1
Counterst. ¶ 36.

Market Investigators work in CVS's Loss Prevention
Department. The parties dispute the precise reporting chain for
Market Investigators, but agree that Market Investigators are
supervised by at least Regional Loss Prevention Managers
("RLPMs"). Each RLPM oversees a team of Market Investigators
within a geographic territory of CVS stores. See Gaites Decl.
Ex. 1 at CVS 00002887.

CVS also employs Store Managers, who are responsible for the operations of their assigned "home stores" and for ensuring that the CVS employees working at their assigned home stores adhere to CVS policies. Lamarr-Arruz R. 56.1 Counterst. ¶ 10. Store Managers are supervised by "District Managers," who "supervise[] day to day operations of stores including [Loss Prevention] related operation functions." Gaites Decl. Ex. 1 at CVS 00002887. The parties dispute whether Store Managers have supervisory power over Market Investigators when the Market Investigators work in the Store Managers' home stores. See Lamarr-Arruz R. 56.1 Counterst. ¶¶ 11-17.

However, there is agreement that, because Market Investigators work at many different CVS stores, they also work with many different Store Managers. The degree and frequency with which any individual Market Investigator interacts with any individual Store Manager varies depending on a variety of factors, including respective work schedules; indeed, a Market Investigator may work at a CVS store without encountering a Store Manager. See, e.g., Lamarr-Arruz R. 56.1 Counterst. ¶¶ 34-37; Ansollari R. 56.1 Counterst. ¶¶ 37-38; Gottlieb Decl. Ex. 1 (Lamarr-Arruz Dep. dated Mar. 22, 2016) at 143-45. Market Investigators generally work independently (in other words, without any other Market Investigators present), although they may also occasionally work in pairs or in groups depending on

need. See, e.g., Gottlieb Decl. Ex. 1 at 137-140; Gottlieb Decl.
Ex. 3 at CVS 0007592; Gottlieb Decl. Ex. 15 (Kerth Pollock Dep.
dated Mar. 29, 2016) at 103-04.

Lamarr-Arruz was supervised by at least RLPM Abdul Saliu.
Lamarr-Arruz R. 56.1 Counterst. ¶¶ 8, 21-22.

Ansoralli was supervised by at least RLPM Anthony Salvatore
for the first four-to-five weeks of her employment. Ansoralli R.
56.1 Counterst. ¶¶ 7, 22. Thereafter, Ansoralli was supervised
by at least RLPM Saliu. Ansoralli R. 56.1 Counterst. ¶ 23.

Saliu and Salvatore were in turn supervised by Senior RLPM
Juan Madrid. Lamarr-Arruz R. 56.1 Counterst. ¶ 9; Ansoralli R.
56.1 Counterst. ¶ 26.

Pursuant to CVS policy, Market Investigators are instructed
to use "five steps" before stopping an individual suspected of
shoplifting, which include: "(1) witnessing the subject enter
the store or aisle and understanding what the subject entered
with; (2) witnessing the selection of the item and identifying
it as unpaid-for CVS property; (3) personally making a direct
observation of the subject concealing CVS merchandise; (4)
maintaining constant surveillance to ensure the item concealed
was not removed or dropped; and (5) ensuring that the subject
has passed all possible points of sale to give the person the
opportunity to pay for the item." Lamarr-Arruz R. 56.1
Counterst. ¶ 6.

7

CVS provides an Employee Handbook and Code of Conduct (the "CVS Handbook") to its employees when they are hired; a copy is also available on the Company's internal Internet portal. Salvatore Decl. ¶ 4. The CVS Handbook prohibits discrimination against CVS employees and customers on the basis of (among other things) race and color. Salavatore Decl. Ex. 1 (CVS Handbook dated Jan. 2012) at CVS 00003058.[5] At least superficially, racial profiling and other forms of discrimination have no place in shoplifter apprehension, loss prevention, or the operations of CVS stores.

However, Lamarr-Arruz and Ansoralli testified to a pervasive racially discriminatory culture at CVS stores (which CVS denies). The plaintiffs testified to repeated instructions by Saliu, Salvatore, and several Store Managers to monitor and apprehend Hispanic and black customers, who were referred to in opprobrious and racist terms, such as "nigger," "spic," "black bitch," and "Spanish bitch." The plaintiffs testified that they were instructed to monitor and stop black and Hispanic customers even when there was no basis to suspect those individuals of shoplifting under the five steps. The plaintiffs testified that

---

[5] During the relevant period, there were two operative versions of the CVS Handbook, the earlier with a revised version date of January 2012, the later with a revised version date of May 2012. Salvatore Decl. ¶ 4. It is undisputed that the two versions are, as relevant to this case, materially similar. Accordingly, only the January version will be cited unless otherwise noted.

they and other black and Hispanic employees were likewise the targets of degrading, racist epithets. See, e.g., Gottlieb Decl. Ex. 1 at 159, 164-65, 243-44, 247, 251-54, 259-60, 279, 281-82, 285; Gottlieb Decl. Ex. 31 at 138, 165-66, 168, 207, 288-90, 292, 299.

The plaintiffs testified that Saliu instructed them to racially profile customers to meet "quota" numbers. According to the plaintiffs, Saliu said that the quantity of apprehensions is used as a "loss prevention" performance metric. The plaintiffs testified that Saliu told them to stop black and Hispanic customers on false pretenses to boost apprehension numbers. Gottlieb Decl. Ex. 1 at 218-21; Gottlieb Decl. Ex. 31 at 181-83, 203-05.

Numerous other Market Investigators have likewise testified that Saliu, Salvatore, and certain Store Managers subjected them to similarly racist language, and instructed them to profile Hispanic and black customers. See, e.g., Gottlieb Decl. Ex. 14 at 145; Gottlieb Decl. Ex. 15 at 65; Gottlieb Decl. Ex. 18 ¶¶ 7, 11-15.

In the event of discrimination, the CVS Handbook provides:

Employees are expected to report incidents of inappropriate behavior, unlawful discrimination, workplace violence, and workplace or sexual harassment as soon as possible after they occur.

Employees who believe they have witnessed or have been subjected to unlawful discrimination, workplace

violence or harassment, regardless of whether the offensive act was committed by a supervisor, coworker, vendor, visitor or customer, should promptly notify their supervisor or their Human Resources Manager. If the employee's supervisor is involved in the incident, the employee should report the incident to their Human Resources Manager or to the Employee Relations Department at the Customer Support Center. Employees may call the CVS Caremark Ethics Line at any time to report any incidents of unlawful discrimination, workplace violence or harassment. Please refer to the Resource Guide for contact numbers.

This policy and the CVS Resources Guide provide a variety of different internal CVS Caremark contacts to whom you may bring any complaint or concern you have about workplace sexual harassment, workplace harassment based on protected personal characteristics, workplace violence, unlawful discrimination and/or retaliation you believe you have suffered because you complained about such conduct. It is hoped that most complaints of this nature and incidents can be resolved within CVS Caremark.

Salavatore Decl. Ex. 1 at CVS 00003059. In the event of a

complaint, the CVS Handbook provides:

Every claim of unlawful discrimination, workplace violence or harassment will be treated seriously, no matter how trivial it may appear. All complaints of inappropriate conduct will be promptly and thoroughly investigated by the Human Resources Manager and/or the respective department manager. . . .

There shall be no retaliation for filing or pursuing a bona fide unlawful discrimination . . . claim or for participating in good faith in the investigation.

Salavatore Decl. Ex. 1 at CVS 00003060.

Ana Valentin, the Senior Advisor of Human Resources ("HR")

at CVS, testified to a decentralized process for reporting

complaints, explaining that "employees make complaints to store

managers . . . [and to] any member of management in the company.
It could be anybody." Gottlieb Decl. Ex. 27 (Valentin Dep. dated
July 29, 2016) at 9, 17. According to Valentin: "We tell [CVS
employees] that they should address issues with their direct
supervisor or their supervisor's supervisor. Kind of workup
[sic] the chain that way, but if that doesn't help solve their
issue, then they could reach out to anyone in the support team.
So sometimes they call HR. Sometimes they call the district
manager. They can reach [out] to the employee relations manager,
the [loss prevention] group, the training group. There's a lot
of resources available to them." Gottlieb Decl. Ex. 27 at 20-
21.

Valentin explained that, under CVS's policies, a Store
Manager or RLPM who receives a complaint should report the
complaint to Valentin herself and the relevant CVS District
Manager. However, Valentin also explained that the ways in which
the recipients of complaints treat complaints are inconsistent;
she noted that not all complaints are elevated up the reporting
chain. Gottlieb Decl. Ex. 27 at 17-20. Valentin explained that
district managers and regional managers have "autonomy" in
"handling and investigating complaints." Gottlieb Decl. Ex. 27
at 18.

At least superficially, CVS provides a robust method for
reporting and investigating discriminatory acts. CVS asserts

that it has no record of a complaint by either plaintiff about race discrimination during their respective employments. CVS employees have denied receiving any such complaints. See CVS R. 56.1 Statement in Supp. of Lamarr-Arruz Mot. ¶¶ 39-40, 48-57; CVS R. 56.1 Statement in Supp. of Ansoralli Mot. ¶¶ 43-48. However, the plaintiffs each testified that they repeatedly raised complaints through various channels about racially degrading comments and directions to profile on the basis of race, but that nothing was done.

Ansoralli never called CVS's ethics "hotline" to report discrimination during her employment (although she testified that she did call the hotline after her employment ended). Ansoralli R. 56.1 Counterst. ¶ 42; Gottlieb Decl. Ex. 31 at 313-14. But Ansoralli testified that, during her employment, once she was transferred to Saliu's team, she complained to him about his instructions to racially profile black and Hispanic customers. Gottlieb Decl. Ex. 31 at 183, 196, 202-03. She later complained to Salvatore (her former supervisor) about Saliu. Gottlieb Decl. Ex. 31 at 280-81, 315. Ansoralli also testified that she complained numerous times to a Store Manager about the use of derogatory language and instructions to racially profile. Gottlieb Decl. Ex. 31 at 135-39. Ansoralli testified that the Store Manager (who was unaware of whether CVS even had an HR

department) simply advised her to escalate her complaints, but took no action himself. Gottlieb Decl. Ex. 31 at 314.

Lamarr-Arruz testified that, soon after starting work, he complained to Saliu about racial profiling and derogatory comments, and asked to be transferred to another team. Lamarr-Arruz testified that Saliu berated him, refused to authorize a transfer, and reduced his hours. Gottlieb Decl. Ex. 1 at 186, 189-91, 225.

Lamarr-Arruz testified that he felt that he was being "bullied" and "targeted" because he refused to racially profile customers. Lamarr-Arruz testified in detail that, around May 2013, he escalated his complaints to senior RLPM Madrid and CVS's HR Department. See, e.g., Gottlieb Decl. Ex. 1 at 186, 191-192, 204 (Lamarr-Arruz testifying to calling the ethics hotline to report that he "was being forced to discriminate against people"), 206-08, 218-219 (Lamarr-Arruz testifying: "I told [Madrid] about the racial profiling . . . . I told him about I felt like I was being bullied and targeted because I wasn't willing to do it."), 223-24, 249.

CVS's records reflect that Lamarr-Arruz called the ethics hotline. While the records reflect that he complained about "retaliation" and other matters, they do not reflect that he complained about race discrimination. Gaites Decl. Exs. 4-5.

On May 11, 2013, Lamarr-Arruz sent Madrid an e-mail stating: "I just wanted you to see that again im being forced [to] have several days off and not given 40 hours like everyone else on the te[a]m." Gottlieb, Decl. Ex. 28. The e-mail showed that Lamarr-Arruz was working the fewest hours on Saliu's team. Lamarr-Arruz testified that, before he sent the e-mail, he and Madrid had already discussed the reason for the reduction in hours, namely, his resistance to racial profiling. Gottlieb Decl. Ex. 1 at 225.

Ansoralli testified that, around this time (and after her employment had ended), Madrid called her about a meeting that he had had with Lamarr-Arruz in which Lamarr-Arruz discussed the use of "derogatory and racial slurs." Gottlieb Decl. Ex. 31 at 264. On the call, the two discussed Ansoralli's own experience with racial profiling and derogatory language at CVS. Gottlieb Decl. Ex. 31 at 265-68. Ansoralli testified that Madrid explained that he was aware of previous race discrimination complaints about Saliu, but insisted that Ansoralli not take legal action. Gottlieb Decl. Ex. 31 at 269-71.

CVS records show that Madrid contacted Lamarr-Arruz. While the records show that Mardid discussed several issues with Lamarr-Arruz related to Saliu's treatment of him, they do not show that they discussed racial discrimination. Gaites Decl. Ex. 6, at CVS 00004264, 00004273.

The plaintiffs adduced evidence that other CVS Market
Investigators and customers have complained to CVS about various
kinds of racial discrimination at CVS that would be subject to
the CVS Handbook's reporting procedures. For example, one Market
Investigator complained about discrimination in promotion
practices to Salvatore. Gottlieb Decl. Ex. 32. Although the
complaint was forwarded to Valentin, Valentin could not recall
if CVS investigated the complaint. Gottlieb Decl. Ex. 27 at 74-
75.

Another RLPM, Joseph Burgess, testified to receiving
several complaints about racial discrimination from Market
Investigators and customers, but he did not elevate the issues
to HR or document the complaints of racial profiling. Gottlieb
Decl. Ex. 33; Gottlieb Decl. 34 at 26-33, 120-23, 140-41.

Lamarr-Arruz took a medical leave on July 10, 2013. Ex. 68
(Leave of Absence Approval). Lamarr-Arruz testified that he
attempted to return to work in late 2013 on a reduced three-day
per week schedule due to medical issues. Gottlieb Decl. Ex. 1 at
315, 317-20; see also Exhibit 69 (E-mail from Saliu dated Dec.
26, 2013). Lamarr-Arruz testified that he was then given a
runaround: he called HR, who directed him to call an RLPM.
Burgess, the RLPM that he reached, directed him to call Saliu,
who refused to return his calls. Lamarr-Arruz reached back to
HR, who informed him that an RLPM would have to approve his

return to work. He was eventually terminated in May 2014.
Gottlieb Decl. Ex. 1 at 315-18.

In an e-mail dated December 26, 2013, Saliu told Burgess
that Lamarr-Arruz had been calling him to ask for permission to
return to work, but that he was not answering Lamarr-Arruz's
calls. Burgess replied that he had spoken to Lamarr-Arruz, that
Lamarr-Arruz wanted to return to work on "light duty," and that
he wanted to work at a store near his home in Brooklyn, which
would mean that he would have to work in a store within Saliu's
territory. Burgess told Saliu that Lamarr-Arruz "would reach out
to you see if you had openings close to [his] house," to which
Saliu tersely replied, "No thank you." Gottlieb Decl. Ex. 69.

Valentin testified that the reason that Lamarr-Arruz was
terminated was because Lamarr-Arruz had requested a sedentary
work role, which CVS could not accommodate. Gottlieb Decl. Ex.
27 at 46, 61. Lamarr-Arruz swears that he never requested that
accommodation. Gottlieb Decl. Ex. 92 ¶ 7.

CVS employee records from May 16, 2014 reflect that Lamarr-
Arruz had requested that accommodation, which would be denied.
Gottlieb Decl. Ex. 70 at CVS 00004287. CVS records from May 15,
2014 --- the day before --- state that Lamarr-Arruz was "ready
to [return to work] with modified duty but the [manager] (Joe)
said that [CVS] [had] no space." Gottlieb Decl. Ex. 70 at CVS
00004287. CVS records from May 28, 2014 reflect that Lamarr-

Arruz was terminated for failing to return from medical leave in a timely fashion. Myers Decl. Ex. 8 at CVS 0005274.

### III.

CVS has moved to dismiss each plaintiff's claims pursuant to § 1981 for a hostile work environment based on race. CVS has also moved to dismiss the NYSHRL and NYCHRL claims but concedes that if the § 1981 hostile work environment claims survive, then those claims survive as well.[6] Accordingly, only the claims pursuant to § 1981 will be discussed.

Under § 1981, a plaintiff must establish two elements to prove a hostile work environment based on race. First, a

---

[6] "The standard for hostile work environment claims under Title VII, § 1981, § 1983, and the NYSHRL is the same." Lewis v. Roosevelt Island Operating Corp., No. 16-cv-03071 (ALC), 2017 WL 1169647, at *6 n.5 (S.D.N.Y. Mar. 28, 2017) (collecting cases). Cases interpreting hostile work environment claims under these provisions are generally cited interchangeably.

The standards governing hostile work environment claims under the NYCHRL are more permissive. To establish actionable conduct under the NYCHRL, a plaintiff need only prove by a preponderance of the evidence that the plaintiff was treated less well than other employees because of a protected characteristic. Williams v. New York City Hous. Auth., 872 N.Y.S.2d 27, 39 (App. Div. 2009). Actionable conduct can be imputed to the employer in three instances: "(1) where the offending employee 'exercised managerial or supervisory responsibility' . . . ; (2) where the employer knew of the offending employee's unlawful discriminatory conduct and acquiesced in it or failed to take 'immediate and appropriate corrective action'; and (3) where the employer 'should have known' of the offending employee's unlawful discriminatory conduct yet 'failed to exercise reasonable diligence to prevent [it].'" Zakrzewska v. New Sch., 928 N.E.2d 1035, 1039 (N.Y. 2010) (citation omitted). The Faragher-Ellerth affirmative defense, dismissed below, is inapplicable to NYCHRL claims. Id.

plaintiff must demonstrate that the harassment was "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (internal quotation marks omitted). Isolated incidents typically will not create a hostile work environment, unless the incidents are so severe that they alter the terms and conditions of employment. Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004), superseded in part on other grounds by, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (amending 42 U.S.C. § 1981). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Tolbert v. Smith, 790 F.3d 427, 439 (2d Cir. 2015) (quoting Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002)). More recently, the Court of Appeals noted that it has not foreclosed "the possibility that the one-time use of a severe racial slur could, by itself, support a hostile work environment claim when evaluated in the cumulative reality of the work environment." Daniel v. T & M Protection Res., LLC, 689 F. App'x 1, 2017 WL 1476598, at *1 (2d Cir. 2017). The court there stressed the impact of "the use of an unambiguously racial epithet . . . by a supervisor in the presence of his subordinates." Id. (quotation marks omitted).

Second, the plaintiff must show a specific basis for imputing the hostile work environment to the employer. Id.

To analyze the first element of a hostile work environment claim, courts consider the "totality of the circumstances, in light of such factors as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Patterson, 375 F.3d at 227 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). In addition, the plaintiff must show not only that the plaintiff subjectively perceived the environment to be abusive, but also that the environment was objectively hostile and abusive. Littlejohn v. City of New York, 795 F.3d 297, 321 (2d Cir. 2015); Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004). Further, "[i]t is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." See Tolbert, 790 F.3d at 439; see also Mondesir v. N. Shore LIJ Health Sys., No. 14-cv-6496 (JGK), 2016 WL 6952254, at *2-3 (S.D.N.Y. Nov. 28, 2016).

CVS concedes that the first element cannot provide a basis for dismissing Lamarr-Arruz's claims. However, CVS argues that the evidence has failed to show that Ansoralli is Hispanic, and

thus, CVS argues, she cannot show that she was subjected to a hostile work environment based on her race.

CVS principally focuses on the second element, arguing that each plaintiff has failed to set forth sufficient evidence to impute any hostile work environment to CVS.

### A.

CVS argues that Ansoralli cannot establish a hostile work environment based on her race because she is not in fact Hispanic and thus was not discriminated against because of a protected trait. CVS bases its argument on Ansoralli's testimony that she "never identif[ies] [herself] as Hispanic." Gottlieb Decl. Ex. 31 at 169. CVS also faults Ansoralli for pleading that she is merely "Guyanese and Portuguese" as opposed to "Hispanic." SAC ¶ 13. CVS argues that Ansoralli has presented evidence that she was only discriminated against based on her national origin, as opposed to race.

The distinction CVS purports to draw is irrelevant for purposes of § 1981. As the Court of Appeals for the Second Circuit recently observed in Village of Freeport v. Barrella, 814 F.3d 594, 602-06 (2d Cir. 2016), courts have struggled with the precise definition of "Hispanic." However, the precise definition of Hispanic is not an obstacle because "'racial discrimination,' for purposes of § 1981, [includes] discrimination based on 'ancestry or ethnic characteristics.'"

Id. at 604-05 (quoting Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987)). CVS's arguments (amazingly, given the vigor with which they are asserted) ignore "longstanding Supreme Court and Second Circuit precedent . . . that 'race' includes ethnicity for purposes of § 1981, so that discrimination based on Hispanic ancestry . . . constitutes racial discrimination under that statute." Id. at 598.

Whether Ansoralli self-identifies as "Hispanic" is not dispositive of whether she was discriminated against based on her race or whether she is in fact Hispanic for purposes of § 1981.[7] See id. at 605 (noting that a person can belong to more than one race for purposes of § 1981 and that what a person self-identifies as on a census form is not dispositive). The United States Census Bureau currently defines "Hispanic" as referring to "a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin regardless of race."[8] While the Census Bureau treats "Hispanic" as a national origin, "race" for purposes § 1981 encompasses Hispanic

---

[7] The parties do not argue that this issue should be analyzed differently for purposes of the federal and state law claims. See Barrella, 814 F.3d at 609 n.53 (noting that Hispanic may be defined differently under state and federal law).

[8] See U.S. Census Bureau, Overview of Race and Hispanic Origin: 2010, available at https://www.census.gov/prod/cen2010/briefs/c2010br-02.pdf. As the Court of Appeals observed, the Census Bureau's definition of "Hispanic" has changed over time. See Barrella, 814 F.3d at 617.

"ethnicity." See id. at 605, 607 & n.47. Accordingly, without demarcating the outer boundaries of the term "Hispanic," a plaintiff who can at least meet the Census Bureau's definition of "Hispanic" can establish that she is racially Hispanic for purposes of § 1981.

Ansoralli testified that she identifies herself racially as West Indian and Spanish. Gottlieb Decl. Ex. 31 at 169, 308. Ansoralli also testified that when she told a Store Manager that she was "West Indian mixed with Spanish," the Store Manager responded, "Oh, you're a spick." Gottlieb Decl. 31 at 165-66; see also Gottlieb Decl. 31 at 207 (Ansoralli testifying that Saliu called her a "spick"). Ansoralli testified that derogatory comments about "Hispanics, [her] origin, [her] people . . . affected her greatly." Gottlieb Decl. 31 at 267. Contrary to CVS's arguments, a reasonable jury could conclude that Ansoralli understands that she is Hispanic even if she does not self-identify as Hispanic (not that self-identification is dispositive for purposes of § 1981). Moreover, Ansoralli testified that Salvatore told her "that there's a lot of niggers and spics . . . a lot of niggers and Spanish people is stealing in the store," which she found offensive because she is "Spanish." Gottlieb Decl. 31 at 313; see also Gottlieb Decl. 31 at 400 (Ansoralli testifying that she finds the term "spick" offensive "because [she is] half Spanish"). Ansoralli testified

that Saliu frequently referred to CVS customers as "Spanish bitches" who "shoplift" and need to be locked up. Gottlieb Decl. 31 at 192.

Construing the evidence in the light most favorable to the plaintiffs, a reasonable jury could plainly find that Ansoralli was discriminated against because of her Spanish/West Indies ancestry, in other words, her race. See Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987) ("There can be no question that [§ 1981's protections] includes persons like plaintiff who are of Puerto Rican descent."); Alvarez-Soto v. B. Frank Joy, LLC, No. CV TDC-15-1120, 2017 WL 2731300, at *2, *9 (D. Md. June 23, 2017) (referring to "Spanish-speaking employees as 'spics'" supported inference of discrimination). A reasonable jury could conclude that, although Ansoralli may not self-identify as Hispanic, she is in fact Hispanic for purposes of § 1981 and that she was the target of discrimination on that basis.

CVS also contends that Ansoralli's request to transfer back to Salvatore's team after she had worked with Saliu undercuts any reasonable inference that she was offended by racial discrimination. The evidence shows that both Salvatore and Saliu discriminated against Ansoralli. A reasonable jury could conclude that Ansoralli viewed Salvatore as the lesser of two evils. See Guzman v. News Corp., No. 09-cv-09323 (LGS), 2013 WL

5807058, at *14 (S.D.N.Y. Oct. 28, 2013) ("Civility toward a
harasser does not excuse harassment or signify subjective
acceptance, particularly in an employment setting.").

Contrary to CVS's arguments, Salvatore's derogatory
comments to Ansoralli during her pre-employment interview for
the Market Investigator position can contribute to her hostile
work environment claim. See, e.g., Ahmed v. Astoria Bank, No.
16-cv-1389, 2017 WL 1906726, at *1 (2d Cir. May 9, 2017)
(summary order); Moss v. Ret. Value, LLC, No. CIV. 12-157 (JBS),
2013 WL 5816657, at *7 (D.N.J. Oct. 29, 2013). The cases cited
by CVS do not suggest a contrary rule. Moore v. Pa. Dep't of
Military & Veterans Affairs, 216 F. Supp. 2d 446, 448-49 (E.D.
Pa. 2002), and Lovoi v. Alitalia Airlines, No. CIV.A. 00-0597,
2002 WL 1423267, at *5 n.5 (E.D. La. June 27, 2002), are
inapplicable because those cases involved claims by applicants
who were never hired. CVS simply misconstrues Spruill v. Kip
Killmon's Tysons Ford, Inc., No. 1:12-cv-806 (AJT), 2012 WL
4829339 (E.D. Va. Oct. 10, 2012), which noted that "comments and
incidents involving others can also be 'relevant to determining
whether [a plaintiff] was subjected to' a hostile work
environment," but that the plaintiff there was unaware of the
other incidents. Id. at *4 n.1. Ansoralli testified that
Salvatore made the objectionable comments directly to her.

24

Accordingly, there are genuine disputes of material facts as to whether Ansoralli was subjected to a hostile work environment, and the defendant does not dispute that Lamarr-Arruz was subjected to a hostile work environment.

**B.**

CVS contends that neither plaintiff can establish the second element of a hostile work environment claim.

"In addition to showing that a hostile work environment existed, 'in order to establish employer liability under . . . [§ 1981], and the NYSHRL for hostile actions taken by employees, a plaintiff must establish that the hostile work environment can be imputed to the employer.'" McCall v. Genpak, LLC, No. 13-cv-1947 (KMK), 2015 WL 5730352, at *27 (S.D.N.Y. Sept. 30, 2015) (alterations and citations omitted). The manner in which hostile conduct is imputed to the employer differs depending on whether the purported wrongdoer is a "supervisor" or "coworker":

> If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions. In cases in which the harasser is a "supervisor," however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013) (citations omitted); accord Wiercinski v. Mangia 57, Inc., 787 F.3d 106, 113 (2d Cir. 2015). A company's defense to its supervisor's conduct is known as the Faragher/Ellerth affirmative defense. See Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). The burden in on the employer to establish both elements of the defense. Vance, 133 S. Ct. at 2439.

### (i)

CVS concedes that RLPMs are supervisors. The evidence shows that RLPMs can, among other things, hire and fire Market Investigators.

However, CVS argues that the evidence shows that Store Managers are not the supervisors of Market Investigators, but their co-workers. For the purpose of vicarious liability under § 1981, a supervisor is a person empowered by the employer "to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Vance, 133 S. Ct. at 2443 (quoting Ellerth, 524 U.S. at 761). "Only a supervisor has the power to cause 'direct economic harm' by taking a tangible employment action." Id. at 2448 (citation omitted). According to

26

the Supreme Court, "supervisory status can usually be readily determined, generally by written documentation." Id. at 2443.

This is not a case where supervisory status is readily determinable. Read in the light most favorable to the plaintiffs, written documentation cuts against CVS's argument. The Market Investigator Job Description states that a Market Investigator "reports directly to a [RLPM], and regularly to Store Management and District Sales Managers," Gottlieb Decl. Ex. 3, while its Market Investigator Training Module describes a Store Manager as the "supervisor on duty." Gottlieb Decl. Ex. 4 at 10, 31. CVS's Area Loss Prevention Director R.J. Gaites and Senior RLPM Madrid each described Store Managers as managers on duty who have operational control of their home stores. CVS Exhibit G (Madrid Dep. dated July 27, 2016) at 32; Gottlieb Decl. Ex. 12 at 85-87.

There is other evidence to suggest that Store Managers are supervisors within the meaning of Vance. RLPM Salvatore admonished a group of Market Investigators to improve their job performance because "the manager pays you not me." Gottlieb Decl. Ex. 9. When asked what he meant by that, Salvatore testified that "[Market Investigator] hours are operational hours. They're not Loss Prevention hours," and that he was worried that Store Managers might start wondering why they "[paid] for these Market Investigators." Gottlieb Decl. Ex. 13

at 112. Similarly, Salvatore testified that Store Managers determined whether Market Investigators could work overtime, which Salvatore did not "care [about] because it's not [his] payroll." Gottlieb Decl. Ex. 13 at 116-17 (Salvatore testifying that he did not "manage" Market Investigator overtime). The plaintiffs also adduced evidence that a Store Manager had the power to block Market Investigators from working in the Store Manager's home store. Gottlieb Decl. Ex. 13 at 113 (Salvatore testifying: "[T]he [Store Manager] could say that and we would have to follow it.").

Against this evidence is the testimony and sworn statements of various CVS employees claiming that Store Managers do not have supervisory power over Market Investigators.

A reasonable jury could determine that, under CVS's organizational structure, RLPMs and Store Managers have coextensive supervisory power to take tangible employment actions against Market Investigators. Construing the evidence in the light most favorable to the plaintiffs, a reasonable juror could conclude that a Store Manager at least had the power to pay (or not pay) Market Investigators (including, but not limited to, overtime) and to prevent a Market Investigator from working at a specific CVS store. A jury could conclude that such actions are tangible employment actions and that Market Investigators are thus supervisors for purposes of § 1981. See

<u>Vance</u>, 133 S. Ct. at 2445, 2447 n.9, 2448; <u>Equal Opportunity</u> <u>Employment Comm'n v. United Health Programs of Am., Inc.</u>, 213 F. Supp. 3d 377, 418 (E.D.N.Y. 2016) (power to reassign is indicia of supervisory authority).

**(ii)**

CVS argues that it can invoke the <u>Faragher/Ellerth</u> affirmative defense to defeat the plaintiffs' claims.

Initially, an employer may only raise the defense if "the employee's supervisor took no tangible employment action" or "any tangible employment action taken against the employee was not part of the supervisor's discriminatory harassment." <u>Ferraro</u> <u>v. Kellwood Co.</u>, 440 F.3d 96, 101 (2d Cir. 2006). "The word 'culminate' requires that the tangible employment action be linked to the supervisor's discriminatory harassment." <u>Id.</u> at 102. As addressed below in the context of Lamarr-Arruz's retaliation claim, there is a genuine dispute of material fact whether the discriminatory harassment Lamarr-Arruz experienced culminated in Lamarr-Arruz's termination. Accordingly, the defense cannot foreclose a trial with respect to Lamarr-Arruz. See <u>Gore v. RBA Grp., Inc.</u>, 03-cv-9442 (KMK), 2008 WL 857530, at *7 (S.D.N.Y. Mar. 31, 2008).

Moreover, there are genuine disputes of material fact whether CVS has met either element of the <u>Faragher/Ellerth</u> affirmative defense. CVS points to its Handbook, which it argues

provided a reasonable means for reporting incidents of
discrimination to the Company. Pursuant to the Handbook, CVS
argues that employees could always call the ethics hotline about
any discriminatory incident. CVS also argues that employees
could report incidents of discrimination to direct supervisors
(which the Company, in the Market Investigator context,
interprets as limited to RLPMs) or, if the supervisor was the
alleged wrongdoer, to the HR Department. The plaintiffs point to
Valentin's testimony to argue that CVS is construing its policy
too narrowly because an employee could also report incidents to
the employee's supervisor's supervisor (in other words, Senior
RLPMs) or any other supervisor (such as Store Managers and
District Managers).

Addressing the first element of the Faragher/Ellerth
affirmative defense, there are genuine disputes of material fact
whether CVS reasonably provided the corrective measures it said
it would in its Handbook, which, as written, were reasonable.[9]
See Ferraro, 440 F.3d at 102 ("[T]he existence of an
antiharassment policy . . . is not always dispositive."). The
testimony by Lamarr-Arruz that his complaints to the ethics

---

[9] Szwalla v. Time Warner Cable, LLC, 135 F. Supp. 3d 34 (N.D.N.Y.
2015), aff'd, 670 F. App'x 738 (2d Cir. 2016), is
distinguishable because a reasonable juror could conclude that
CVS failed to exercise "reasonable care in preventing and
correcting harassing behavior because they failed to follow
their stated anti-harassment policies and procedures." Id. at
45.

hotline were ignored raises questions regarding whether the

hotline was a viable means of reporting racial discrimination.

Similarly, the evidence raises genuine disputes of material

facts about whether complaining to a supervisor was a reasonable

avenue to report discrimination or a false promise. While the

CVS Handbook states that "All complaints of inappropriate

conduct will be promptly and thoroughly investigated by the

Human Resources Manager and/or the respective department

manager," Salavatore Decl. Ex. 1 at CVS 00003060, there is

sufficient evidence to conclude that that protocol was not

followed by supervisors and that the written policy was thus

window dressing. See Mills v. George R. Funaro & Co., No. 99-cv-

4816 (LAP), 2001 WL 50893, at *11 (S.D.N.Y. Jan. 19, 2001) ("[A]

genuine issue of fact exists as to whether [the] policy had

force."); Wilkins v. Time Warner Cable, Inc., 10 F. Supp. 3d

299, 314 (N.D.N.Y. 2014).

The testimony by Ansoralli that Madrid told her that he was

separately aware of Saliu's conduct, but did nothing, in

conjunction with the other evidence, could lead a reasonable

juror to conclude that adhering to the CVS Handbook's reporting

procedure did not present any meaningful "corrective

opportunities." Sawka v. ADP, Inc., No. 13-cv-754 (VAB), 2015 WL

5708571, at *15 (D. Conn. Sept. 29, 2015); see also Alonzo v.

Chase Manhattan Bank, N.A., 70 F. Supp. 2d 395, 398 (S.D.N.Y.

1999). Moreover, if the jury credits the testimony of the plaintiffs, it could conclude that CVS should have investigated their claims of racial discrimination. See Mills, 2001 WL 50893, at *11.

Addressing the second element of the Faragher/Ellerth affirmative defense, a reasonable jury could find that the plaintiffs reasonably used the corrective opportunities provided by CVS, even as they are interpreted by CVS. Lamarr-Arruz testified that he called the ethics hotline on several occasions to report incidents of racial discrimination. CVS concedes that Lamarr-Arruz called the hotline to complain about retaliation, but argues that its records show that Lamarr-Arruz complained about matters other than racial discrimination. CVS also asserts that its records show that Lamarr-Arruz subsequently reported that the concerns had been resolved. Lamarr-Arruz disputes the accuracy of the records and swears that he never told anyone at HR that he was being treated fairly or that his concerns had been addressed. Gottlieb Decl. Ex. 92. ¶¶ 3-4. This presents a genuine dispute of material fact over which is more trustworthy, CVS's internal records or testimony by Lamarr-Arruz, and whether CVS acted reasonably in response to any complaints made by Lamarr-Arruz. See Goffe v. NYU Hosp. Ctr., 201 F. Supp. 3d 337, 357 (E.D.N.Y. 2016). The plaintiffs' theory that CVS has poor record keeping is bolstered by several pieces of evidence,

including Ansoralli's testimony that she called the hotline after her termination --- a call for which CVS has no record --- and the evidence showing that CVS does not consistently document complaints of racial discrimination or escalate such complaints up the reporting chain, as required by the CVS Handbook.

Moreover, Lamarr-Arruz testified that he complained about racial discrimination to Madrid, who was Saliu's supervisor. That version of events is corroborated by Ansoralli. Construing the evidence in the light most favorable to the plaintiffs, based on, among other things, the CVS Handbook and Valentin's testimony, a reasonable jury could find that complaining to a supervisor's supervisor about discrimination was permissible under CVS's policy and that Lamarr-Arruz reasonably availed himself of that corrective measure.

Ansoralli did not call the ethics hotline during her employment. Ansoralli complained to Salvatore and Saliu, which CVS argues was insufficient because they were her alleged harassers. However, Ansoralli testified that she repeatedly reported discrimination to a Store Manager, who simply recommended that she direct her concerns elsewhere. Construing the evidence in the light most favorable to the plaintiffs, a reasonable jury could decide that the Store Manager, as a supervisor, should have done more. Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 104-05 (2d Cir. 2010) (victims of

discrimination are not required, "in order to preserve their rights, [to] go from manager to manager until they find someone who will address their complaints"). A reasonable jury could find that complaining to a Store Manager was permissible under CVS's policy and that Ansoralli reasonably availed herself of that corrective measure.[10]

Finally, to the extent that a jury finds that Store Managers were co-workers, the Faragher/Ellerth affirmative defense would be unavailable for their conduct. Based on the foregoing considerations, a reasonable jury could clearly find that CVS negligently ignored the complaints of racial discrimination by the plaintiffs. See Holt v. Dynaserv Indus., Inc., No. 14-cv-8299 (LGS), 2016 WL 5108205, at *9 (S.D.N.Y. Sept. 19, 2016).

## IV.

CVS has moved to dismiss Lamarr-Arruz's retaliation claim pursuant to § 1981. As with the hostile work environment claims, CVS concedes that if the § 1981 retaliation claim survives,

---

[10] The cases cited by CVS are distinguishable. In Lara v. City of New York, No. 97-cv-7663 (DLC), 1999 WL 459803, at *7 (S.D.N.Y. June 29, 1999), the plaintiff never used any of the procedures outlined in a written policy; in this case, a reasonable jury could conclude that the plaintiffs used the policy as instructed, but to no avail. Unlike the plaintiff in Rubin v. Abbott Laboratories, No. 13-cv-8667 (CM), 2015 WL 5679644, at *12 (S.D.N.Y. Sept. 23, 2015), each plaintiff complained to more than just the harassers.

Lamarr-Arruz's retaliation claims under the NYSHRL and NYCHRL survive as well.

Retaliation claims are governed at the summary judgment stage by the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Gorzynski, 596 F.3d 93, 110 (2d Cir. 2010). Under the McDonnell Douglas framework, the plaintiff carries the initial burden of establishing a prima facie case of retaliation. See McDonnell Douglas, 411 U.S. at 802. "To establish a prima facie case of retaliation, [the plaintiff] must show that (1) [the plaintiff] was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012) (citations omitted). If the plaintiff meets this initial burden, the defendant must point to evidence of a legitimate, non-retaliatory reason for the challenged action. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). If the defendant meets its burden, then "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Id.; see also Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.,

973 F. Supp. 2d 386, 408 (S.D.N.Y. 2013), aff'd, 586 F. App'x 739 (2d Cir. 2014).

Lamarr-Arruz's theory is that CVS delayed his return to work from medical leave and ultimately terminated him because he was complaining about racial discrimination. Construing the evidence in the light most favorable to Lamarr-Arruz, a reasonable jury could credit that claim. See Attis v. Solow Realty Dev. Co., 522 F. Supp. 2d 623, 630 (S.D.N.Y. 2007).

CVS's arguments that Lamarr-Arruz cannot make out a prima facie case of retaliation are without merit. CVS contends that Lamarr-Arruz cannot show that he had engaged in a protected activity, or CVS's awareness of any such activity, because the evidence did not show that he was complaining about racially derogatory language and instructions to racially profile (as opposed to other matters). See Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d 10, 14 (2d Cir. 2013) (noting that for a complaint to qualify as protected activity, the plaintiff must establish that the plaintiff possessed "a good faith, reasonable belief that the underlying challenged actions of the employer violated the law") (citation and internal quotation marks omitted). For the reasons already discussed, a reasonable jury could credit Lamarr-Arruz's testimony that he had made such complaints about racial discrimination to HR, Saliu, and Madrid. A jury could further

36

conclude that CVS was thus aware of those complaints for
purposes of both the second and fourth elements of the
retaliation claim, see Henry v. Wyeth Pharm., Inc., 616 F.3d
134, 147-48 (2d Cir. 2010), but failed to document them.

Lamarr-Arruz testified that he raised complaints about race
discrimination repeatedly but most vigorously in May 2013. It is
undisputed that his ultimate termination constituted an adverse
employment action. CVS, however, argues that the link to his
ultimate termination in May 2014 is too attenuated to establish
a causal link.

CVS ignores the evidence that it prevented Lamarr-Arruz
from returning to work in December 2013. "[A] plaintiff can
indirectly establish a causal connection to support a . . .
retaliation claim by showing that the protected activity was
closely followed in time by the adverse [employment] action."
Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.,
252 F.3d 545, 554 (2d Cir. 2001). Lamarr-Arruz went on medical
leave soon after he had complained in July 2013 and first tried
to return to work, at the latest, five months later in December
2013. CVS then forced Lamarr-Arruz to jump through hoops. HR
told Lamarr-Arruz that he needed the approval from an RLPM.
Burgess told Lamarr-Arruz he needed approval from Saliu. Saliu -
-- Lamarr-Arruz's primary alleged harasser --- dodged repeated
calls and in private communications with Burgess categorically

rejected the notion that Lamarr-Arruz be allowed to return to work in a store that he managed. CVS's records show that Burgess refused to approve Lamarr-Arruz's return to work because there was "no room." A reasonable jury could conclude that December 2013, when Lamarr-Arruz sought to return to work, was the first meaningful opportunity that CVS had to take a retaliatory action against Lamarr-Arruz. A reasonable jury could conclude that while his official termination occurred in May 2014, his fate was sealed in December 2013. Contrary to CVS's arguments, the gap of at most five months between Lamarr-Arruz's latest complaint and Saliu's action --- which plausibly precipitated Lamarr-Arruz's termination for failure to return from medical leave --- does not defeat Lamarr-Arruz's claim. See Goonewardena v. N.Y. Workers Comp. Bd., No. 09-cv-8244 (RA), 2017 WL 2799171, at *13 (S.D.N.Y. June 28, 2017) (collecting cases that have found retaliation claims actionable based on gaps of longer than five months between the protected activity and retaliation).

CVS argues that it had legitimate reasons to terminate Lamarr-Arruz, which Lamarr-Arruz argues were prextextual. A plaintiff alleging retaliation must show that retaliation "was a 'but-for' cause of the adverse action, and not simply a 'substantial" or 'motivating' factor in the employer's decision"; however, "'but-for' causation does not require proof that retaliation was the only cause of the employer's action,

but only that the adverse action would not have occurred in the
absence of the retaliatory motive." Kwan v. Andalex Grp. LLC,
737 F.3d 834, 845-46 (2d Cir. 2013) (citation omitted)
(retaliation causation under Title VII). The same "but for"
causation standard for retaliation applies in § 1981 cases as
exists for Title VII cases. Georges v. Peters, 581 F. App'x 80
(2d Cir. 2014). "A plaintiff may prove that retaliation was a
but-for cause of an adverse employment action by demonstrating
weaknesses, implausibilities, inconsistencies, or contradictions
in the employer's proffered legitimate, nonretaliatory reasons
for its action." Kwan, 737 F.3d at 846.

CVS proffers two reasons for terminating Lamarr-Arruz: CVS
argues that it ultimately discharged Lamarr-Arruz because he
exceeded the time he was allowed to be on medical leave and
because he had requested an accommodation to perform sedentary
work. Myers Decl. Ex. 8 at CVS 0005274; Gaites Decl. Ex. 9 at
CVS 0005301. However, there is sufficient evidence for a
reasonable jury to conclude that those reasons were pretextual.

With respect to the first reason, the determination that
Lamarr-Arruz had exceeded his medical leave occurred in May
2014, months after Lamarr-Arruz tried unsuccessfully to return
to work in December 2013. A reasonable jury could conclude that
the timeline does not make sense and thus that the purported
reason is pretextual.

With respect to the second reason, Lamarr-Arruz denies that he requested a sedentary work accommodation, and instead testified that he asked to work three-days per week, a similar schedule to one he had before he went on medical leave. There was no mention that Lamarr-Arruz wanted a sedentary accommodation in the e-mail in which Saliu told Burgess that he did not want Lamarr-Arruz working for him. While CVS portrays its recordkeeping as robust, its records are silent as to Saliu's position on Lamarr-Arruz's return to work. CVS's records show that Burgess attributed the reason for rejecting Lamarr-Arruz to lack of need. It was only later that CVS attributed the refusal to allow him to come back to work to something else: Lamarr-Arruz's purported request for a sedentary accommodation. CVS's "shifting and somewhat inconsistent" explanations for Lamarr-Arruz's termination support an inference that his termination was pretextual. See id.

Construed in the light most favorable to Lamarr-Arruz, the six-month delay between the time Lamarr-Arruz requested his job back and CVS's reporting that he had requested a sedentary accommodation supports the inference that his termination was pretextual. CVS forced Lamarr-Arruz to ping-pong between HR and different RLPMs. Saliu dodged his phone calls. Burgess offered a different reason for rejecting him. CVS ultimately purported to terminate him because he had exceeded his medical leave and

because it could not make an accommodation that Lamarr-Arruz denies requesting. Based on the evidence, a reasonable jury could conclude that the reason CVS terminated Lamarr-Arruz was based on his complaints about race discrimination.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, CVS's motions for summary judgment are **denied**. The Clerk is directed to close the motions for summary judgment.

SO ORDERED.

Dated:     New York, New York
           September 26, 2017

                                    John G. Koeltl
                            United States District Judge

41